# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| TAYLOR BURKE, as Personal Representative for the Estate of Michael Reagan, Jr., deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 6:23-CV-113-JAR |
| ADEL MALATI, M.D., in his individual capacity, | ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This is a civil rights action brought under 42 U.S.C. § 1983 by plaintiff Taylor Burke, as Personal Representative for the Estate of Michael Reagan, Jr., based on alleged violations of the United States Constitution by defendant Adel Malati, M.D., in his individual capacity, during Mr. Reagan's detention at Okmulgee County Criminal Justice Authority ("OCCJA") in Okmulgee, Oklahoma. Before the Court is Dr. Malati's motion for summary judgment. [Dkt. 84].[1] Plaintiff submitted a timely response [Dkt. 99], and Dr. Malati replied [Dkt. 104]. By consent of the parties [Dkt. 21], and pursuant to Fed. R. Civ. P. 73(a) and 28 U.S.C. § 636(c)(1), the undersigned United States Magistrate Judge exercises complete jurisdiction over this action through and including trial and entry of a final judgment.

### I.    UNDISPUTED MATERIAL FACTS [2]

Mr. Reagan was booked into OCCJA on the morning of January 3, 2020. [Dkt.

---

[1] For clarity and consistency herein, when the court cites to the record, it uses the pagination and document numbers provided by CM/ECF.

[2] Unless otherwise noted, the following facts are undisputed for summary judgment purposes.

99-12]. Upon intake, Nurse Janette Hansen received several prescription medications, including gabapentin, prescribed for Mr. Reagan's seizure disorder. [Dkt. 99-13 at 1 (noting all medications were "expired" upon their delivery)]. Later that day, Nurse Hansen conducted a medical intake screening and documented Mr. Reagan's seizure history. [Dkt. 99-14].

On January 9, 2020, OCCJA's medical doctor, Dr. Malati, prescribed four medications for Mr. Reagan, including gabapentin. [Dkt. 99-2; Dkt. 99-3 at 5 (35:4-9)]. Pursuant to his employment agreement and OCCJA policy, Dr. Malati was responsible for making all final judgments concerning inmate health care, had supervisory authority over all medical personnel, was to ensure that outside medical resources and specialized treatment were available to provide a full range of health care options, and was obligated to assist in training medical staff. [Dkt. 99-8, §§ 1.1, 3.4; Dkt. 99-22, § 15-1.5]. Dr. Malati admittedly never provided any training to jail nurses. [Dkt. 99-3 at 7 (62:7-65:8), 10 (132:5-11)]. OCCJA policy further required that inmates have "regular access to a medical staff member who is qualified to screen, refer, and provide basic treatment for ongoing or emerging health care problems." [Dkt. 99-17, § 15-5.4].

During the relevant period, Dr. Malati was physically present at the jail about once per week and was otherwise on call at all times. [Dkt. 84 at 11, ¶¶ 26-27; Dkt. 99 at 10, ¶¶ 26-27]. Jail nurses had his cell phone number and were authorized to contact him at any time regarding inmate health issues. [Dkt. 84-4, ¶ 5]. Although Dr. Malati testified that jail nurses had complete discretion to decide when to call an

ambulance, [Dkt. 84-4, ¶ 6; Dkt. 99-3 at 10 (132:5-11)], Nurse Julie Bauer testified that she was required to contact her nursing supervisor and then Dr. Malati before calling EMS for an inmate, [Dkt. 104-1 at 3 (24:2-19)]. In any event, Dr. Malati was never contacted about Mr. Reagan's condition or medication refusals and never personally examined him. [Dkt. 84 at 8, ¶ 6; Dkt. 99 at 6, ¶ 6; Dkt. 84-4, ¶¶ 7-8].

During his ten-day detention, Mr. Reagan declined his prescribed medications on all but one occasion. [Dkt. 99-13 at 3]. At approximately 4:20 a.m. on January 10, 2020, Nurse Margret Hillburn responded to Mr. Reagan's cell after he reported a seizure and stated he "couldn't see." After assessing his vital signs, Nurse Hillburn documented no apparent abnormalities and instructed Mr. Reagan's cellmate to notify staff if further seizure activity occurred. [Dkt. 99-15 at 2]. Later that day, around 7:00 p.m., detention officers found Mr. Reagan on the floor of his cell in a "seizure-like state," escorted him to medical, and he reported not having slept since arrival. [Dkt. 99-15 at 1; Dkt. 99-16]. Medical staff administered prescribed medications and returned him to his cell. At approximately 10:45 p.m. that evening, staff again responded to Mr. Reagan's cell for "possible seizure activity." Mr. Reagan stated that he "was sick" and asked "to go to [a] hospital." [Dkt. 99-15 at 1]. Medical staff advised that, while he could go to medical for evaluation, there was "as of yet … no reason to be sent to the hospital." [*Id*. at 1, 3].

At approximately 7:20 a.m. the next day, Mr. Reagan pushed a nurse during pill pass and was transferred to a segregation cell. [Dkt. 99-18]. In the early morning hours of January 13, Captain Lane Wilson heard banging from the segregation unit

3

and directed Shift Supervisor Miguel Rivera ("Sgt. Rivera") and Detention Officer Joseph Terry to investigate. [Dkt. 9-6 at 2-5]. They found Mr. Reagan on his back on the cell floor with blood under his head and observed that he appeared to be having a seizure. [*Id.* at 2]. Nurse Bauer responded at approximately 3:01 a.m. and, together with Officer Terry and Sgt. River, transported Mr. Reagan to the nurses' station, arriving around 3:05 a.m. [*Id.* at 5]. Nurse Bauer recorded that Mr. Reagan was "not responsive to verbal stimuli" and had an elevated heart rate. [*Id.* at 1].

Mr. Reagan was then wheeled to cell H114, located near Nurse Bauer's office, where he was placed on the floor. [Dkt. 9-4 at 10-11 (45:23-46:4); Dkt. 99-6 at 2-3]. Because she was the only nurse on duty, Nurse Bauer then left OCCJA to deliver paperwork to another detention center. [*Id.* at 12-13 (48:21-49:7); Dkt. 99-6 at 3]. At around 3:30 a.m., an inmate notified jail staff via intercom that Mr. Reagan "was having a seizure" and "vomiting blood." [Dkt. 99-6 at 5, 7]. Sgt. Rivera and Officer Terry responded within minutes and found Mr. Reagan unresponsive on the floor. [*Id.* at 3; Dkt. 9-20]. Nurse Bauer was informed of further seizure-like activity and requested that Mr. Reagan be transported to an emergency room by an OCCJA transport officer. [Dkt. 99-6 at 1].

At approximately 3:40 a.m., Nurse Bauer entered cell H114 and observed "what appeared to be more seizure activity." She checked for a pulse and respirations but found none, and CPR was initiated. [*Id.*]. An ambulance arrived at 4:00 a.m. and departed seven minutes later with Mr. Reagan, who was unresponsive, pulseless, and apneic. [Dkt. 99-5 at 1, 3]. He was pronounced deceased at 5:11 a.m. [Dkt. 99-7 at 3].

## II.   PROCEDURAL HISTORY

In April 2021, plaintiff filed a §1983 action against OCCJA, several members of jail staff, and Dr. Malati based on allegations arising from Mr. Reagan's death. [Dkt. 84 at 9, ¶ 16; Dkt. 99 at 8, ¶ 16]. On March 31, 2022, plaintiff and Dr. Malati stipulated to dismissal without prejudice. [Dkt. 84-1].

Plaintiff initiated this action on March 30, 2023, and amended his complaint on March 13, 2024, asserting a § 1983 claim for deliberate indifference to serious medical needs in violation of the Eighth and Fourteenth Amendments. [Dkt. 28]. Plaintiff alleges that Dr. Malati was responsible for developing and implementing jail policies, ensuring the provision of adequate medical care, training medical staff, and supervising OCCJA medical personnel, and that his failure in these respects caused constitutionally inadequate care to Mr. Reagan [*Id.* at ¶¶ 7, 28, 55, 59-62, 70-81].

## III.   GOVERNING LEGAL STANDARDS

### A.   SUMMARY JUDGMENT

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. At the summary judgment stage, the court's task "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S.

650, 656 (2014) (*quoting Anderson*, 477 U.S. at 249). In making that determination, a court must view the evidence "in the light most favorable to the opposing party." *Id*. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Insu. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## B.    CLAIMS, THEORIES, AND DEFENSES UNDER § 1983

Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting under color of state law. 42 U.S.C. § 1983. Thus, a successful § 1983 plaintiff must show that (1) a right secured by the Constitution or laws of the United States was violated, and (2) the alleged violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

### 1.    Deliberate Indifference to Serious Medical Needs

Claims based on failure to provide adequate medical care are governed by the "deliberate indifference to serious medical needs" standard articulated in *Estelle v. Gamble*, 429 U.S. 97 (1976). The Eighth Amendment "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency' … against which we must evaluate penal measures," including the government's obligation to provide medical care to incarcerated persons who cannot provide it for themselves. *Id*. at 102-03 (internal quotations omitted). Deliberate indifference to serious medical needs constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment and is actionable whether manifested by medical staff or by guards who

6

deny or delay access to care or interfere with prescribed treatment. _Id_. at 104-05. These principles apply to pretrial detainees through the due process clause of the Fourteenth Amendment. _Howard v. Dickerson_, 34 F.3d 978, 980 (10th Cir. 1994).

Deliberate indifference has both objective and subjective components. _Wilson v. Seiter_, 501 U.S. 294, 298-99 (1991). The objective component is satisfied where the harm is "sufficiently serious," such as a condition that results in significant suffering or death. _Id_.; _Mata v. Saiz_, 427 F.3d 745, 753 (10th Cir. 2005). The subjective component requires proof that the defendant-official knew of and disregarded a substantial risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and must also draw that inference. _Farmer v. Brennan_, 511 U.S. 825, 837 (1994). This standard is akin to criminal recklessness and may be established by circumstantial evidence. _Id_. at 836, 843; _Martinez v. Beggs_, 563 F.3d 1082, 1089 (10th Cir. 2009).

Prison and jail officials violate the Constitution when they "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." _Sealock v. Colorado_, 218 F.3d 1205, 1211 (10th Cir. 2000). In applying these principles, the Tenth Circuit has required a showing that a particular official actually appreciated the substantial risk of serious harm and then disregarded it. _See, e.g., Wise v. Caffey_, 72 F.4th 1199, 1210-12 (10th Cir. 2023) (analyzing deliberate indifference claims against jail officers and medical staff in light of inmate's symptoms and their responses).

7

### 2.    Supervisory Liability

Individual-capacity claims against supervisory officials are governed by the "affirmative link" framework. Such officials may not be held liable on a theory of *respondeat superior*; instead, a plaintiff must establish an affirmative link between the supervisor's conduct and the alleged constitutional violation. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). The affirmative-link requirement has three elements: (1) the supervisor's personal involvement, (2) a causal connection between the supervisor's actions and the constitutional violation, and (3) a culpable state of mind. *Id*.

Personal involvement may be shown by evidence that the supervisor personally participated in the violation, exercised control or direction over the offending subordinates, failed to train or supervise them, or "promulgated, created, implemented or possessed responsibility for the continued operation of a policy" that caused the deprivation." *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016) (*quoting Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)). Causation requires that the supervisor "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Id*. The culpable-state-of-mind element aligns with the subjective deliberate indifference standard and asks whether the supervisor knew of and disregarded an excessive risk that his policies, customs, staffing choices, training, or supervisory practices would result in constitutionally inadequate medical care. *See Schneider*, 717 F.3d at 769-70; *Burke v. Regalado*, 935 F.3d 960, 997-1001 (10th Cir. 2019).

8

### 3.   Qualified Immunity

"Individual defendants named in a § 1983 action may raise the defense of qualified immunity," *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 460 (10th Cir. 2013), which "shields public officials … from damages actions unless their conduct was unreasonable in light of clearly established law," *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008). When a defendant asserts qualified immunity, the plaintiff bears the burden to show that (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct. *Cillo*, 739 F.3d at 460; *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may address these prongs in either order. *Pearson*, 555 U.S. at 236. A right is clearly established if it is "sufficiently clear that every reasonable official" would have understood that what he was doing violated that right, typically by reference to "on point" Supreme Court or Tenth Circuit precedent. *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019). Although a case directly on point is not required, existing precedent must place the constitutional question "beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

## IV.   ANALYSIS

The Court first examines whether plaintiff has demonstrated a constitutional violation attributable to Dr. Malati in his supervisory role, and then considers whether that right was clearly established at the time of Mr. Reagan's death.

### A.   CONSTITUTIONAL VIOLATION

Dr. Malati's liability depends upon whether one or more of his subordinates

9

violated Mr. Reagan's constitutional rights. *See Dodds*, 614 F.3d at 1194-95.

### 1.    Underlying Violation by Subordinates (Objective Prong)

The undisputed harm suffered by Mr. Reagan is sufficiently serious to satisfy the objective component of deliberate indifference. *See Martinez*, 563 F.3d at 1088 (death "without doubt" satisfies the objective component).

### 2.    Underlying Violation by Subordinates (Subjective Prong)

As to the subjective component, the record, viewed in the light most favorable to plaintiff, would permit an inference that OCCJA nurses recognized Mr. Reagan faced an ongoing medical crisis but failed to take reasonable steps to investigate and respond. Nurse Hillburn documented that Mr. Reagan stated he "couldn't see" following a seizure on January 10, yet she did not contact Dr. Malati. [Dkt. 99-15 at 2]. That evening, after additional seizure-like episodes, Mr. Reagan reported he had not slept for seven days and requested to go to the hospital. Nurse Kilo administered his prescribed medications, returned him to his cell, and advised there was "no reason to be sent to the hospital," without seeking higher-level evaluation or summoning EMS. [*Id.* at 1, 3; Dkt. 99-16]. In the early hours of January 13, after officers and Nurse Bauer observed Mr. Reagan with seizure-like symptoms and decreased responsiveness, he was left on the floor of a cell while Nurse Bauer left the facility, and a substantial further delay occurred before EMS was summoned, despite an intercom call reporting another seizure and vomiting of blood. [Dkt. 99-4 at 5 (14:1-10), 13 (49:1-17); Dkt. 99-6; Dkt. 99-20].

On this record, a reasonable jury could find that at least Nurses Kilo and Bauer

10

(and potentially other OCCJA staff) subjectively appreciated a substantial risk that Mr. Reagan—who experienced repeated seizures, reported vision changes and illness, expressly requested hospital care, and ultimately became unresponsive—faced a serious medical emergency yet failed to respond reasonably. *See* *Sealock*, 218 F.3d at 1211-12; *Mata*, 427 F.3d at 755-61.

### B.    SUPERVISORY LIABILITY

Because plaintiff has adduced sufficient evidence of an underlying constitutional violation by OCCJA personnel, the Court next considers whether he has established an affirmative link between that violation and Dr. Malati. *See* *Schneider*, 717 F.3d at 768-69.

### 1.    Personal Involvement

The personal-involvement element may be satisfied by showing that Dr. Malati personally participated in the violation; exercised control or direction over the offending subordinates; failed to train or supervise them; or "promulgated, created, implemented or possessed responsibility for the continued operation of a policy" that caused the underlying deprivation. *Keith*, 843 F.3d at 838 (*quoting* *Dodds*, 614 F.3d at 1195). Plaintiff also may show that he was responsible for but failed to create and enforce policies to protect inmates from having serious medical needs disregarded. *Perry v. Durborow*, 892 F.3d 1116, 1122-23 (10th Cir. 2018). In jail-medical-care cases, the Tenth Circuit examines whether the supervisor's policy choices created or maintained a system in which constitutional violations were a plainly obvious consequence. *See e.g., Burke*, 935 F.3d at 999-1001. Here, plaintiff proceeds on three

theories: failure to implement necessary policies, failure to train, failure to supervise.

### a.    Failure to Implement Necessary Policies

Plaintiff relies heavily on the employment agreement and jail policy, which provide that Dr. Malati shall make all final judgments relating to inmate health care, have supervisory authority over all medical personnel, approve and annually review OCCJA health care policies, ensure access to outside resources including emergency care, and assist in the training medical staff. He also points to the former OCCJA director's testimony that although the director wrote jail policies, it was Dr. Malati's responsibility to implement jail healthcare policies. [Dkt. 99-9 at 2 (130:1-21), 3 (135:10-13)]. Plaintiff contends that, despite this authority, Dr. Malati failed to implement policies requiring or clearly directing LPNs to contact a physician or call EMS when inmates with known seizure disorders experienced recurrent seizures, reported vision changes, or requested hospital care.

The record permits a reasonable jury to find that Dr. Malati possessed responsibility for the continued operation of the medical policy framework at OCCJA and could have implemented more specific escalation policies for seizure-related emergencies. *See* _Dodds_, 614 F.3d at 1199-1200. While Dr. Malati maintains that nurses could independently contact EMS and points to the absence of any formal restriction on emergency transport or consultation, Nurse Bauer's conflicting account of escalation protocol renders such assertions materially disputed.

### b.    Failure to Train

A supervising official may be liable for failure to train where there is

12

"essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable," but it is insufficient to allege "general deficiencies" in training. *Keith*, 843 F.3d at 838 (quotations omitted). The plaintiff must identify a specific deficiency closely related to his ultimate injury and show that this deficiency actually caused the subordinates to act with deliberate indifference. *Id*. Here, plaintiff identifies as the specific deficiency the absence of any concrete training from Dr. Malati instructing LPNs on when to call an ambulance or escalate to a higher-level provider for seizures and similar emergencies. [Dkt. 99 at 22-27]. He links this deficiency to the employment agreement's partial assignment of training responsibility and to Dr. Malati's testimony that he provided no such specific training and instead relied on LPN licensure and general orientation. [Dkt. 98-8, § 3.4; Dkt. 99-3 at 6 (46:4-48:22), 7 (62:7-65:3)].

Plaintiff has adequately demonstrated Dr. Malati's personal involvement under a failure-to-train theory. The undisputed fact that Dr. Malati provided no training or escalation guidance to medical staff is sufficient, on its own, to tie his direct conduct to the alleged deficiency. His testimony confirming the absence of such instruction establishes a specific omission traceable to his contractual duties. Although the record does not indicate prior incidents or audits that would have alerted him to these deficiencies, such notice concerns relate more appropriately to issues of causation and state of mind. *See Keith*, 843 F.3d at 838.

### c.    *Failure to Supervise*

Failure-to-supervise claims are analyzed under the same basic framework as

failure-to-train claims, but focus on day-to-day oversight rather than formal instruction. *See Dodds*, 614 F.3d at 1195-99; *Burke*, 935 F.3d at 999-1001. Plaintiff again relies on the employment agreement's allocation of supervising responsibilities to Dr Malati, and cites Dr. Malati's testimony that he spent about one hour per week seeing inmates at OCCJA while also serving as medical director at multiple other facilities. [Dkt. 99-3 at 2 (24:10-25:25)]. Plaintiff argues that this limited on-site presence, combined with heavy reliance on LPNs who lacked concrete escalation guidance, effectively left nurses unsupervised in making critical medical decisions for inmates like Mr. Reagan.

The employment agreement, together with Dr. Malati's admittedly limited on-site presence, reasonably supports the inference that he did not adequately discharge his supervisory duties over OCCJA medical staff as they delivered frontline care to inmates. Under Tenth Circuit precedent, a supervisor expressly charged with overseeing medical personnel and implementing medical policies, yet alleged to have left LPNs effectively unsupervised in managing serious medical conditions, may be found personally involved in any ensuing violations. *See e.g., Dodds*, 614 F.3d at 1199-1200; *Burke*, 935 F.3d at 999-1001. Plaintiff's failure-to-supervise theory therefore satisfies the personal-involvement element.

### 2.  Causation

To establish causation, plaintiff must show that Dr. Malati "set in motion a series of events" that he "knew or reasonably should have known" would cause his subordinates to deprive Mr. Reagan of his constitutional rights. *Keith*, 843 F.3d at

14

838. In supervisory-liability cases, the inquiry often focuses on whether policy, training, or supervisory decisions made the violation a plainly obvious consequence. *See Burke*, 935 F.3d at 999-1001; *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1048-52 (10th Cir. 2022).

Plaintiff contends that Dr. Malati implemented and maintained a medical system that relied almost entirely on LPNs, left them clinically unsupervised for most of the week, and provided confusing or incomplete protocols while failing to train them on seizure emergencies and hospital transfer criteria. Plaintiff argues that this system, in combination with Dr. Malati's knowledge of Mr. Reagan's seizure disorder from prescribing gabapentin, created a foreseeable risk that LPNs would delay contacting a physician or EMS when Mr. Reagan experienced multiple seizures, reported vision issues, requested hospital care, and grew increasingly unresponsive. Dr. Malati responds that any failings by jail nurses on January 10-13 were isolated misjudgments and not the foreseeable product of his system-level decisions, and again emphasizes his materially disputed testimony that jail nurses could call EMS without his permission.

Tenth Circuit precedent indicates that structural deficiencies, combined with the certainty that staff will confront recurring medical emergencies, can create a jury question where a system delegates emergent assessments to minimally trained staff without guidance. *See Burke*, 935 F.3d at 999-1001; *Prince*, 28 F.4th at 1048-52. Plaintiff's evidence concerning the absence of specific escalation training and Dr. Malati's materially disputed belief that LPNs could escalate inmate medical issues

15

without his involvement is sufficient, at this stage, to create a triable issue on whether his decisions "set in motion" the events leading to Mr. Reagan's death.

### 3.    Deliberately Indifferent State of Mind

The remaining question is whether a reasonable jury could find that Dr. Malati acted with deliberate indifference in that he knew of and disregarded an excessive risk that his policies, customs, or supervisory practices would result in constitutionally inadequate medical care. *See* _Schneider_, 717 F.3d at 769-70. Plaintiff argues that a jail medical director in Dr. Malati's position would appreciate that inmates routinely present with seizures and other serious conditions, that relying primarily on LPNs without meaningful escalation guidance creates a substantial risk of delayed emergency care, and that choosing to maintain such a system despite these obvious risks amounts to deliberate indifference. He analogizes to _Burke_, where the sheriff allowed well-documented systemic deficiencies to persist for years, and contends that similar inferences may be drawn here from the structure of OCCJA's medical operations and Dr. Malati's limited on-site involvement. [Dkt. 99 at 28-31].

Dr. Malati emphasizes that plaintiff has not presented evidence of prior incidents, audits, or complaints putting him on notice of systemic failures comparable to those in _Burke_. He further notes the absence of evidence that he was informed about Mr. Reagan's medication refusals, seizure complaints, or emergency response issues; that he had any reason to believe nurses did not understand they could call EMS; or that OCCJA had a history of similar events involving seizure patients. [Dkt. 84 at 20-22; Dkt. 104 at 3-5]. On his view, plaintiff's evidence, at most, supports

16

negligence in designing or operating OCCJA's medical system, which is insufficient to establish deliberate indifference.

The Court concludes, however, that the question of whether plaintiff has offered sufficient evidence for a jury to find that Dr. Malati acted with deliberate indifference is a closer one than with respect to the subordinate staff, and ultimately turns on how the factfinder evaluates the obviousness of the risks posed by OCCJA's staffing, training, and supervisory framework in light of Dr. Malati's acknowledged role and limited direct involvement.

## C.    CLEARLY ESTABLISHED LAW

Plaintiff principally invokes _Burke_ to contend that Dr. Malati's alleged conduct violated clearly established law, arguing that this Tenth Circuit decision gave fair warning that a jail official charged with implementing medical policies, supervising jail nurses, and conducting trainings can be held liable for deliberate indifference when systemic decisions create a substantial risk of serious harm. [Dkt. 99 at 29-30]. S_ee Quinn v. Young_, 780 F.3d 998, 1013 (10th Cir. 2015) (noting it is "well-settled" that "[t]he plaintiff bears the burden of citing … what he thinks constitutes clearly established law.").[3] Elsewhere in his response, plaintiff relies on _Prince_, _Crowson v. Wash. Cnty., Utah_, 983 F.3d 1166 (10th Cir. 2020), and _Estate of Jensen by Jensen v. Clyde_, 989 F.3d 848 (10th Cir. 2021), to contend that jail policymakers may be held

---

[3] "Constitutional rights are clearly established when Tenth Circuit or Supreme Court precedent _particularized to the case_ at issue exists." _Shepherd v. Robbins_, 55 F.4th 810, 815 (10th Cir. 2022) (emphasis added). "_Materially similar facts_ can make the precedent sufficiently particularized." _Id_. (emphasis added). Thus, a right is clearly established when operable precedent encompasses "materially similar conduct" or applies "with obvious clarity" to the conduct at issue. _Id_.

liable when they design or maintain a medical system that renders constitutional violations a plainly obvious consequence. [Dkt. 99 at 22-23]. Each of these authorities, however, is materially distinguishable from the present case.

In *Burke*, the Tenth Circuit emphasized that the sheriff had been repeatedly alerted—through audits, reports, and other notifications—to years-long, systemic deficiencies in jail medical care, yet failed to implement corrective measures. *See* 935 F.3d at 999-1001. By contrast, plaintiff identifies no comparable pattern of audits, reports, or complaints showing that Dr. Malati was ever informed of recurring emergency-response failures or known training deficiencies at OCCJA prior to Mr. Reagan's death, and thus *Burke* does not clearly establish liability for a part-time medical director who lacked such notice.

*Prince* involved a sheriff who had "actual knowledge of numerous systemic problems" with jail health care and faced evidence that he was responsible, in his official capacity, for failing to medically train jail employees, inadequately staffing the jail, and delaying inmate medical attention. *See* 28 F.4th at 1049-51. Here, in contrast, there is no showing that Dr. Malati had direct, documented notice of "numerous systemic problems" comparable to those in *Prince*, or that he personally ignored repeated warnings about dangerous delays in care.

*Crowson* likewise does not provide clearly established guidance for this case. There, the Tenth Circuit reversed the denial of qualified immunity to an infrequently on-site jail physician where the alleged violation was premised on his diagnostic choices, concluding it was not clearly established that "reaching a diagnosis without

18

blood test results violated the plaintiff's rights where the plaintiff's symptoms were consistent with either withdrawal or encephalopathy." 983 F.3d at 1183-84. <u>Crowson</u> thus confirms that, in materially similar circumstances involving an off-site jail physical, the law was not clearly established as to the physician's clinical decisions, and it does not address—much less clearly prohibit—the kind of higher-level supervisory and structural choices at issue here.

In <u>*Estate of Jensen*</u>, the Tenth Circuit found a triable issue of deliberate indifference as to an on-site "gatekeeper" nurse who personally observed a detainee's severe, worsening withdrawal symptoms yet failed to call the part-time physician or secure hospital care, but it declined to impose liability on the physician based solely on higher-level policy or training theories in that posture. *See* 989 F.3d at 955-59. <u>*Estate of Jensen*</u> therefore underscores the potential liability of frontline gatekeepers who directly witness and disregard an inmate's obvious need for care, while simultaneously signaling that the Tenth Circuit would not extend clearly established law to a similarly situated part-time physician on a purely supervisory theory like the one plaintiff advances here.

The Court therefore finds that <u>*Burke*</u>, <u>*Prince*</u>, <u>*Crowson*</u>, and <u>*Estate of Jensen*</u> do not clearly establish a constitutional violation by Dr. Malati—a largely off-site, on-call medical director/jail physician who was never contacted about the decedent's seizure-related issues, never personally involved in his care, and not on notice of recurring emergency-response failures or known training deficiencies—based on his maintenance of a system that authorizes licensed nurses to call EMS without

19

providing detailed escalation guidance. Those decisions involve officials who had direct, documented notice of recurring systemic problems, or frontline gatekeepers who personally observed serious medical needs and responded unreasonably or not at all, which is materially different from Dr. Malati's posture. Given that none of plaintiff's cited precedents render his supervisory-liability theories "beyond debate," plaintiff has not met his burden to show that Dr. Malati's alleged conduct violated clearly established law.

## V.    CONCLUSION

Because plaintiff has not shown that the alleged conduct violated clearly established law, the Court concludes that Dr. Malati is entitled to qualified immunity.

IT IS THEREFORE ORDERED that Dr. Malati's motion for summary judgment [Dkt. 84] is hereby **GRANTED**.

IT IS FURTHER ORDERED that the pretrial conference set for April 23, 2026 is hereby **STRICKEN**.

IT IS FURTHER ORDERED that the jury trial set to begin on May 4, 2026 is hereby **STRICKEN**.

DATED this 16th day of April, 2026.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE